Texoma Supply Company v. Commissioner.
Texoma Supply Co. v. Commissioner
Docket No. 52401.
United States Tax Court
T.C. Memo 1958-36; 1958 Tax Ct. Memo LEXIS 196; 17 T.C.M. (CCH) 147; T.C.M. (RIA) 58036; February 28, 1958
*196 In 1947 an individual who for the past 10 years had conducted a sole proprietorship business caused the petitioner to be formed to take over the business and assets of the proprietorship. As part of the consideration for the business and assets, the petitioner issued $100,000 par value of its unsecured 20-year, 5 per cent debentures. Held, that the debentures did not represent indebtedness and that deductions taken by petitioner as interest thereon were not allowable. Fred M. Winner, Esq., and Richard Tull, Esq., for the petitioner. Frank C. Conley, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency of $3,853.44 in the income tax of the petitioner for the taxable period February 18, 1947, through *197 December 31, 1947, and a deficiency of $3,989.19 for the year 1948. The year 1949 is involved because of a net operating loss carry-back from 1949 to the taxable period February 18, 1947, through December 31, 1947, and to 1948. By stipulation of the parties all of the issues have been except one, namely, the correctness of the respondent's action in disallowing deductions of $4,305.59, $5,000 and $5,000 taken by petitioner for the taxable period February 18, 1947, through December 31, 1947, and for the years 1948 and 1949, respectively, as interest on its outstanding debentures. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner is a Colorado corporation, formed February 18, 1947, and has its principal office in Tulsa, Oklahoma. It filed its Federal income tax returns for the taxable period February 18, 1947, through December 31, 1947, and for the years 1948 and 1949 with the collector in Oklahoma City, Oklahoma. From or about 1915 until 1937 Carl J. Hochenauer was employed as sales representative successively by various manufacturers and suppliers of materials and equipment used in the petroleum industry. In his employment he *198 solicited orders from various oil producers. As a result of the knowledge and experience he had acquired and of the acquaintances or contacts he had made, he decided to enter business for himself. In 1937 he began the operation of a sole proprietorship business under the name of Texoma Supply Company with his office in Tulsa, Oklahoma. His principal business was that of a distributor of oil well supplies and equipment, selling particularly to the production part of the petroleum industry specialty items such as tubular supplies and equipment used in the oil fields. Hochenauer solicited orders for supplies and equipment and under oral arrangements with manufacturers and other suppliers placed the orders with them for shipment directly to those from whom the orders had been obtained. Under the arrangement when a supplier shipped supplies and equipment, title thereto passed from the supplier to Hochenauer and an account payable owing by him to the supplier arose. When the supplies and equipment reached the party to whom they had been shipped, title thereto passed from Hochenauer to that party and there arose an account payable owing by such party to Hochenauer. Hochenauer confined his *199 solicitation activities to products which could be shipped from the supplier to the user. He did not have any warehouse and did not maintain any inventory. His income from the business was derived from charging and collecting from his customers for the supplies and equipment shipped to them, sums in excess of those he paid the suppliers therefor. Over the years Hochenauer had established and maintained a close personal relationship with approximately 60 supply companies and with various customers throughout the trade area to whom he supplied various types of oil well supplies and equipment. The substantial volume of business which he had developed over the years was based almost entirely upon his personal relationship with those supply companies and with his customers. If that relationship had ceased, his business would have terminated. The following is a statement of the profit and loss of the sole proprietorship business for the years 1937 through 1946: Year
Profit
Loss
1937
$ 704.16
1938
$ 4,615.39
1939
5,305.37
1940
699.00
1941
7,799.06
1942
8,621.98
1943
7,142.85
1944
10,035.09
1945
13,730.70
1946
6,922.83
Total
$35,102.11
$30,474.32
*200 During 1944 and 1945 Hochenauer made several visits to a hospital in Baltimore, Maryland, where he was told that he had an internal condition which might become malignant and that a period of time would be required to determine whether malignancy would develop. However, by 1947 his health had become normal. Because of the condition of his health, Hochenauer, during 1944 and 1945, considered the question of the future of the proprietorship business and the disposition that might be made of it and the financial provisions which he might make for his wife and daughter in case of his disability or death. During 1945 he entered into negotiations with W. B. Saulsbury, an agent for Kerr-McGee Oil Company, for the sale of the business at a price in excess of $200,000, but the negotiations terminated without a sale having been effected and without Saulsbury having informed Hochenauer as to why he did not purchase the business. Late in 1946 Hochenauer discussed with his accountant and his attorneys a plan which he had formulated for organizing a corporation and transferring to it the proprietorship business and assets used therein for stocks and bonds, as a method whereby the business *201 might be continued and his wife and daughter provided for, in case of his disability or death. The plan as presented to the accountant and the attorneys contemplated the issuance by the corporation of a small number of shares of stock with the shares having a low value in order that three of Hochenauer's key employees, Frederick T. Borgwald, Ray H. Smith and James M. Cleary, who were of limited financial means, could acquire approximately 40 per cent of the stock upon formation of the corporation and the remaining 60 per cent after Hochenauer's death. Hochenauer proposed this arrangement to acquire stock as an incentive or encouragement to the three employees to continue the business after his death and pay interest on the bonds and to pay them at maturity. At the time of the discussion Hochenauer estimated that a gross profit of around $100,000 would be realized on the proprietorship's unfilled orders. Since these orders and the other contacts existing between the proprietorship and its customers and its suppliers were to be transferred to the corporation the plan contemplated the issuance by the corporation of $100,000 par value of its bonds. Hochenauer contemplated leaving the bonds *202 to his wife in the event of his death. At or about the time Hochenauer discussed his plan with his accountant and his attorneys he executed a will in which he made no provision for Borgwald, Smith or Cleary to acquire any stock in the proposed corporation which he might own at the time of his death. One of the principal suppliers represented by Hochenauer was The Youngstown Sheet and Tube Company, Youngstown, Ohio. His representation of that company began in 1939 and extended to January 22, 1947, at which time the company terminated its arrangement with him as to future orders. However, it agreed to and did fill the unfilled orders he theretofore had placed with it. The petitioner was formed on February 18, 1947, with an authorized capital stock of 10,000 shares without nominal or par value. At their first meeting, which was held on February 19, 1947, the board of directors of the petitioner, consisting of Carl J. Hochenauer, Georgenne M. Hochenauer, and Ray H. Smith, elected the following named persons to the indicated offices: Carl J. Hochenauer, President and Treasurer Ray H. Smith, Vice President Georgenne M. Hochenauer, Secretary Frederick T. Borgwald, Assistant *203 Secretary and Assistant Treasurer Thereupon the board of directors adopted a resolution authorizing the petitioner to issue an aggregate principal amount of $100,000 of 5 per cent debentures due February 15, 1967, which might be issued in payment of the debts of the petitioner and might be issued as the purchase price or in exchange for assets or property transferred to the petitioner. In connection with the authorization, the board of directors approved a form for such debentures which, in part, is as follows: "The undersigned Texoma Supply Company, a corporation of the State of Colorado, (hereinafter called 'Company') FOR VALUE RECEIVED, hereby promises to pay to the registered holder hereof, on February 15, 1967, the sum of One Thousand ($1,000) DOLLARS, together with interest thereon from February 15, 1947, at the rate of five per cent (5%) per annum, payable semiannually on the 15th day of February and August of each year, both principal and interest payable at the office of the Company in Tulsa, Oklahoma. "On and after February 15, 1952, the Company has the option of redeeming this Debenture by payment of the principal amount, together with all accrued interest, after thirty *204 days' written notice mailed to the registered holder at his address as shown on the books of the Company. "This Debenture is one of an issue in the aggregate principal amount of $100,000. Debentures are deferred in right to all other debts and obligations of the Company, and all other creditors and classes of creditors of the Company shall be preferred in the payment of their claims to the holders of said Debentures, and no Debentures shall be paid unless the Company retains sufficient assets to then pay all other classes of creditors in full, and in case of dissolution or liquidation of the Company, all debts of liabilities other than such Debentures shall be paid in full before any part of the assets of the Company shall be applied to the payment of Debentures, but holders of such Debenture shall have no preference over each other. "It is expressly understood and agreed and hereby made a condition to the issuance of this Debenture and of its receipt by the original and successive holders thereof that this is exclusively the corporate obligation of the Company and that no past, present or future stockholder, director or officer of the Company, or any successor of the Company is, *205 or shall be held individually liable in any respect under any statute, rule or principale [principal] of law, or otherwise, for the payment of this Debenture, or any part thereof, whether principal or interest, and that each and every such stockholder, director or officer is hereby discharged and released from any such liability, actual or potential, direct or indirect; and all holders hereof agree to look for payment of principal and interest exclusively to the assets of the Company. "This Debenture shall be registered in the name of the holder on the books of the company and such registry shall be noted hereon and this Debenture shall be transferable only on the order of the registered holder, and all payments of principal or interest shall be made to the person in whose name this Debenture is so registered." Following the foregoing action the board of directors accepted an offer from Carl J. Hochenauer to transfer his proprietorship, Texoma Supply Company, to the petitioner in exchange for 100 shares of its capital stock and $100,000 aggregate principal amount of the petitioner's 5 per cent debentures of 1967, the stock to be issued 98 shares to Carl J. Hochenauer, 1 share *206 to Georgenne M. Hochenauer and 1 share to Ray H. Smith, all of the stock to be issued full paid and nonassessable, and the $100,000 of debentures to be issued to Carl J. Hochenauer. After accepting the offer the board of directors adopted the following additional resolutions with respect thereto. "RESOLVED, That this Company take over the assets of the proprietorship known as Texoma Supply Company and assume all outstanding liabilities, and that this Company assume the operations and transactions of the said business from January 1, 1947 to February 19, 1947, and place the same on the books of the Company as a corporate operation. "RESOLVED, That the President of this Company be, and he hereby is, authorized to do or cause to be done, whether alone or in conjunction with other officers of the Company under his direction, all acts or things necessary or convenient to be done to effectuate the acquisition of the proprietorship of Texoma Supply Company." Immediately after the foregoing meeting of petitioner's directors, Carl J. Hochenauer transferred his proprietorship business and the asset used therein to the petitioner which assumed the proprietorship liabilities. In consideration *207 therefor the petitioner issued 100 shares of its capital stock, 98 shares to Carl J. Hochenauer, 1 share to Georgenne M. Hochenauer and 1 share to Ray H. Smith, and issued to Carl J. Hochenauer 100 of its debentures, which were in denominations of $1,000 each and which were unsecured. As of December 31, 1946, the orders which the proprietorship had placed with suppliers and which remained unfilled totaled $1,603,886.93 and the gross profit which it was then estimated would be realized thereon was $95,828.34. Of the foregoing total of unfilled orders as of December 31, 1946, $1,270,055.76 was filled in 1947. The portion of the total estimated gross profit of $95,828.34 applicable to those orders was $78,140.36. The remainder of the orders, or $333,831.17, was filled in 1948. The portion of the total estimated gross profit applicable to those orders was $17,687.98. Of the unfilled orders as of December 31, 1946, approximately 90 per cent had been placed with, and were for products of, Youngstown Sheet and Tube Company. Approximately 10 per cent of the orders had been placed with, and were for the products of, seven other suppliers. The following is a statement of the assets and *208 liabilities of the proprietorship as disclosed by its books on the date of incorporation of the petitioner, February 18, 1947, and a statement of the assets and liabilities which the petitioner placed on its books immediately following its acquisition of the proprietorship business and assets: Assets
Proprietorship
Petitioner
Cash, National Bank of Tulsa
$ 7,966.55
$ 7,966.55
Accounts Receivable - Trade
69,978.37
69,978.37
Inventory - In Transit
23,497.04
23,497.04
Memberships
760.00
760.00
[1] Office Equipment
$2,492.28
Less: Reserve for Depreciation
1,322.68
1,169.60
5,000.00
[1] Automobile
$1,135.22
Less: Reserve for Depreciation
1,135.22
2,100.00
[2] Goodwill
100,000.00
Total
$103,371.56
$209,301.96
Liabilities
Accounts Payable
$ 88,199.51
$ 88,191.51
F. T. Borgwald
55.22
55.22
R. H. Smith
191.85
191.85
Kansas-Compensation Tax Division
131.26
131.26
Louisiana-Department of Revenue
810.31
810.31
New Mexico-Compensation Tax Division
527.71
527.71
Oklahoma-Sales Tax Division
759.35
759.35
Wyoming-Sales Tax Division
49.88
49.88
[3] C. J. Hochenauer
12,649.47
8,579.87
Debenture Bonds
100,000.00
Capital Stock
10,000.00
Total
$103,371.56
$209,301.96
*209 The petitioner's outstanding stock of 100 shares was held by the following persons in the indicated amounts on December 31, 1947, 1948 and 1949: Number of Shares Held
Stockholder
Office Held in Petitioner
1947
1948
1949
Carl J. Hochenauer
President and Treasurer
85
69
98
Ray H. Smith
Vice President
5
10
James M. Cleary [1]
Vice President
10
Frederick T. Borgwald
Secretary and Treasurer
10
Unidentified
11
2
Total
100
100
100
Prior to the incorporation of the petitioner, Ray H. Smith had been employed by Carl J. Hochenauer as a salesman for the proprietorship and shortly after *210 the incorporation of the petitioner he became its sales manager. Frederick T. Borgwald was office manager of the proprietorship and handled the bookkeeping, financial and traffic matters of the business. James M. Cleary was a salesman for the proprietorship. At the time of the formation of petitioner, Smith was 34 years of age, Borgwald was 50 and Cleary was 32. During 1948 Borgwald was found to have misappropriated funds of the petitioner. His connection with the petitioner was terminated and Hochenauer purchased his stock. Subsequently Smith was offered employment by another corporation which he considered had greater possibilities than his connection with the petitioner. He severed his connection with petitioner in February 1949 and Hochenauer purchased his stock. Cleary left the employment of the petitioner in February 1949 and during that year disposed of his stock. Although W. A. Read, who was 27 years of age, became secretary of the petitioner in 1948 after the termination of Borgwald's connection with it, no stock in the petitioner was issued or transferred to him. The petitioner did not pay any dividends on its 100 shares of stock during the years 1947 through 1949. It *211 has never borrowed any money and no additional money has been invested in it. Shortly after petitioner issued $100,000 of its debentures to Hochenauer, he transferred $18,000 of the debentures to Mrs. A. G. Driscoll, his sister, in satisfaction of an obligation to her in the amount of $16,000 which he had incurred prior to the formation of the petitioner. The petitioner has not retired any of its debentures. From the date of its incorporation through 1949 the petitioner maintained its books on an accrual basis. The following is a statement of the total amounts of interest payable accrued by petitioner on its books for the indicated years and the amounts of interest paid during those years with respect to its debentures: Interest Paid
Total Interest
Carl J.
Mrs. A. G.
Year
Accrued
Hochenauer
Driscoll
Total
2/18 thru 12/31/47
$4,305.59
$2,050.00
$450.00
$2,500.00
1948
5,000.00
3,450.00
900.00
4,350.00
1949
5,000.00
2,050.00
900.00
2,950.00
In its income tax returns for the foregoing years the petitioner deducted as interest the amounts it had accrued on its books in the respective years as interest on its debentures. The *212 respondent determined that such amounts did not represent interest and disallowed them as deductions. The following is a statement of the petitioner's gross receipts (including for the period February 18 through December 31, 1947, and for 1948 the amounts received from the unfilled orders as of December 31, 1946, which were filled during those periods), gross, profit, and net income (after deduction of the interest accrued on petitioner's debentures), as reported on the petitioner's income tax returns for the indicated taxable years: Net Income
Year
Gross Receipts
Gross Profit
or (Loss)
2/18 thru 12/31/47
$1,696,171.89
$117,754.06
$28,902.08
1948
1,182,452.87
118,482.71
32,145.13
1949
163,147.93
10,685.05
(18,238.52)
In February 1947 when Hochenauer transferred the proprietorship business and assets to the petitioner for shares of its stock and its debentures, he did not intend to establish and there was not established between petitioner and him the relationship of debtor-creditor as a consequence of the issuance by petitioner of the debentures. Opinion The petitioner seeks to deduct for the respective years as interest the amounts *213 it accrued as such on its books with respect to its $100,000 debentures. The respondent has determined and contends here that those amounts were not interest. Deductions are a matter of legislative grace and one who seeks a deduction must bring himself clearly within the terms of the statute which grants the deduction. New Colonial Ice Co. v. Helvering, 292 U.S. 435; Interstate Transit Lines v. Commissioner, 319 U.S. 390. The provision of section 23(b) of the Internal Revenue Code of 1939 respecting the allowance of interest as a deduction "is designed to permit of the deduction of genuine interest on a genuine indebtedness." Charles L. Huisking & Co., 4 T.C. 595. The primary question for determination is whether in February 1947 when Hochenauer transferred the proprietorship business and assets to the petitioner for stock and debentures there was created by the petitioner, on the one hand, and Hochenauer, on the other, a debtor-creditor relationship as a consequence of the issuance by the petitioner of the debentures. Since Hochenauer was the sole owner of the proprietorship business and assets and upon the transfer thereof to the petitioner *214 became entitled to receive all of the petitioner's stock and thereby was in control of the petitioner, a disposition of the question depends in the last analysis on his intention. The question of intention is a factual one to be resolved from a consideration of the entire record. Gooding Amusement Co., 23 T.C. 408, affd. 236 Fed. (2d) 159, certiorari denied 352 U.S. 1031; Edward G. Janeway, 2 T.C. 197, affd. 147 Fed. (2d) 602. After stipulating that petitioner was formed with an authorized capital stock of 10,000 shares of no par value and that "so-called debenture bonds" were "authorized by the corporation in the total amount of $100,000," the parties further stipulated that "Corporate stock in the corporation was issued in exchange for net tangible assets of the proprietorship." From the position taken by the parties at the hearing and on brief, it appears that by stipulating that corporate stock was issued for net tangible assets the parties were attempting to establish a basis from which the conclusion would be drawn that the debentures were issued for intangible assets, namely, unfilled orders and good will, *215 of the proprietorship. The minutes of the meeting of petitioner's board of directors of February 19, 1947, at which the acquisition by petitioner of the proprietorship business and assets for 100 shares of stock and $100,000 of debentures was authorized, were stipulated in evidence. These minutes contain nothing to indicate that the 100 shares of stock were to be issued for the net tangible assets of the proprietorship and that the debentures were to be issued for the intangible assets. Since the minutes of the directors' meeting make no segregation or allocation of stock or debentures between the classes of assets of the proprietorship, we make none and in our consideration of the matter we will treat both the stock and the debentures as phving been issued for both classes of assets. The petitioner contends that at the time of its formation Hochenauer was in poor health, that the only way he could protect his wife and daughter was to form a corporation to continue the business in case of his disability or death, and to form the corporation with such a small capitalization that in case of his death his key employees could acquire ownership of all the corporation's stock without the *216 immediate investment of substantial sums. While the record shows that during 1944 and 1945 Hochenauer made several trips to a hospital on account of the condition of his health, his testimony shows that during 1947, the year in which the petitioner was formed, his health was normal and that at the time of the trial herein, which was a number of years later, it was fair. As he presented it to his accountant and his attorneys, Hochenauer's plan for the formation of a corporation, which eventuated in the formation of the petitioner, contemplated the issuance by the corporation of a small number of shares of stock with the shares having a low value in order that three of his key employees, Borgwald, Smith and Cleary, could acquire approximately 40 per cent of the stock upon formation of the corporation and the remaining 60 per cent after Hochenauer's death. During 1947 and 1948 each of the three employees acquired 10 shares of petitioner's stock. Before the end of 1948 Hochenauer had reacquired Borgwald's shares and prior to the end of 1949 he also had reacquired Smith's and Cleary's shares. At no time was as much as 40 per cent of the petitioner's stock held by the three employees. *217 Although petitioner's net income for each of the years 1947 and 1948 as reported in its income tax returns for those years was around $30,000, the petitioner did not pay any dividends during those years or during 1949. In view of this and of the fact that Hochenauer was in control of petitioner throughout the years 1947 through 1949, and since the record contains no explanation of the petitioner's failure to pay any dividends, it may well be there was little, if any, incentive for the employees to acquire up to 40 per cent of petitioner's stock. As for the three employees being able to acquire 60 per cent of the petitioner's stock after Hochenauer's death, the evidence shows that at or about the time he discussed his plan for the formation of a corporation with his accountant and his attorneys, he executed a will in which he made no provision for any of the three to acquire any stock in the proposed corporation which he might own at the time of his death. Nor does the record indicate that after the formation of the petitioner he changed his will or made any other arrangement whereby they could acquire any stock in the petitioner which he might own at his death. From the foregoing we *218 fail to see any factual basis upon which the three employees could be expected to continue in the business until Hochenauer's death with the expectation that at that time they could acquire 60 per cent or any other portion of the petitioner's stock or that they would continue the business and pay interest on the debentures and pay the principal of them at maturity. Shortly after the petitioner issued to Hochenauer $100,000 of its debentures, he transferred $18,000 of them to his sister in satisfaction of his obligation to her in the amount of $16,000. Although interest on the debentures as provided by the terms thereof was paid to the sister in each of the years 1947, 1948 and 1949 in which it became payable, this was not the situation with respect to the $82,000 of debentures retained by Hochenauer. By the terms of the debentures, interest in the amount of $4,100 became payable to Hochenauer in each of the years 1948 and 1949. During those years there was paid to him only $3,450 and $2,050, respectively. This resulted in underpayments during those years of $650 and $2,050, respectively. The petitioner has not only not offered any explanation for its delinquency in this respect but *219 has not shown that the delinquent amounts were ever paid or that any portion of amounts becoming payable in years subsequent to 1949 was ever paid. Respecting the consideration transferred by Hochenauer to petitioner for its stock and debentures, the record shows that office equipment which had been carried on the proprietorship's books at a cost of $2,492.28 and which had a depreciated cost of $1,169.60 was entered on petitioner's books at a value of $5,000 which was more than twice the original cost and more than four times the depreciated cost. An automobile which had been carried on the proprietorship books at a cost of $1,135.22 and which had been fully depreciated was entered on petitioner's books at a value of $2,100 or upwards of twice its original cost. When asked for an explanation of the basis upon which the office equipment and the automobile had been revalued and entered on petitioner's books, Hochenauer was unable to give any. Nor does the record otherwise afford any. In such a state of the record it may well be concluded that these assets were arbitrarily written up on petitioner's books. Hochenauer's interest in the proprietorship was shown on its books at $12,649.47. *220 The minutes of the meeting of the petitioner's directors on February 19, 1947, at which the acquisition of the proprietorship business and assets was authorized, show that in addition to the directors' authorizing the issuance of 100 shares of the petitioner's stock and $100,000 of its debentures for the business and assets, they authorized the assumption by petitioner of "all outstanding liabilities" of the proprietorship. Except for an item presently mentioned, there is nothing in the record to indicate that the authorization for assumption of liabilities was intended to authorize the assumption by petitioner as a liability of any portion of Hochenauer's interest in the proprietorship. The statement of assets and liabilities which the petitioner placed on its books immediately following its acquisition of the proprietorship business and assets shows that Hochenauer's interest in the proprietorship of $12,649.47 was placed on petitioner's books as a liability in the amount of $8,579.87. Hochenauer was unable to explain why the item was entered on the petitioner's books as a liability and in the latter amount. Apparently this is another instance of where arbitrary action was taken *221 with respect to entries in petitioner's books. In this connection it is observed that the excess of the amounts at which the office equipment and automobile were entered on petitioner's books over their depreciated cost as shown on the proprietorship books, or $5,930.40, plus the difference between the amount at which Hochenauer's interest in the proprietorship was shown on the proprietorship books and the amount at which such interest was entered on petitioner's books as a liability, or $4,069.60, equals $10,000, the amount at which the petitioner's issued stock of 100 shares was entered on petitioner's books. Granting that the petitioner's directors had authorized the assumption by petitioner as a liability of Hochenauer's interest in the proprietorship, the apparent effect of the revaluation of the office equipment and the automobile upward by $5,930.40 was to show on petitioner's books an indebtedness owing to Hochenauer of an amount which was $5,930.40 in excess of what would have been shown if the revaluation had not been made. Considerable evidence was submitted by petitioner as to the value of the unfilled orders it acquired from the proprietorship and the value of the proprietorship *222 good will, or the business contacts existing between the proprietorship and its customers and suppliers. The petitioner contends that this evidence establishes that the unfilled orders and good will had a value of at least $100,000 and that we should so find. While the record shows that at or about the time the petitioner acquired the proprietorship's existing and unfilled orders, the gross profit that would be realized thereon was estimated at approximately $96,000, it further shows that no estimate was made of the net profit that would be realized from the orders and that petitioner did not maintain any books or records with respect to the orders which would reflect either the gross profit or the net profit actually realized thereon. Concededly the net profit that would be and was realized from the orders was less than the estimated gross profit thereon. In this situation and since the record otherwise does not afford a basis for determining the value of the orders, we make no determination as to their value. Respecting the proprietorship good will, or the business contacts existing between the proprietorship and its customers and its suppliers, the evidence shows that of the *223 unfilled orders acquired by petitioner from the proprietorship approximately 90 per cent were for products of Youngstown Sheet and Tube Company. The remainder of the orders were for the products of seven other suppliers. While the record shows that over the years Hochenauer had established and maintained a close personal relationship with approximately 60 supply companies, it fails to indicate, except as shown above as to Youngstown and the seven other suppliers, the extent to which he over the years had obtained and placed orders for the products of any of the members of that group of companies. Accepting, in the absence of evidence to the contrary, the unfilled orders of the proprietorship as being indicative of its business and customers, it appears that approximately 90 per cent of its business was with Youngstown and customers who ordered its products. However, on January 22, 1947, or approximately a month prior to the formation of the petitioner, Youngstown terminated its arrangement with Hochenauer and advised him that it would fill the orders he theretofore had placed with it but that it would not accept from him any further orders. In view of this and since it is neither shown *224 nor claimed that petitioner ever entered into an arrangement with Youngstown similar to that which Hochenauer formerly had with it, it is apparent that petitioner would not be able to obtain orders for Youngstown products from those proprietorship customers who continued to demand that company's products. The petitioner has not attempted to show the proportion of the proprietorship business which could be expected to be, or was, lost to it as a result of its inability to solicit orders for, and to supply, Youngstown products. Assuming that petitioner would be able to retain the remaining 10 per cent of the proprietorship business and would be able to induce a portion of the proprietorship customers who had theretofore ordered Youngstown products to place orders for the products of other suppliers, we would be unable to conclude that, aside from the unfilled orders, the petitioner had prospects of substantially greater profits from its future operations than had been realized by the proprietorship during its 10-year period of operations. From its inception in 1937 through 1946 the proprietorship operated at a profit for 5 years and at a loss for 5 years. The result of operations *225 for the 10-year period was a net profit of $4,627.79 or an average annual net profit of $462.78. In view of what has been said above, we are unable from the record before us to determine that the proprietorship's unfilled orders and its good will had the value contended for by petitioner. Admittedly the debentures in form are evidences of indebtedness. However, from a consideration of the entire record including the extent to which the debentures were subordinated to the claims of creditors, we have concluded and found as a fact that Hochenauer did not intend to establish and there was not established between petitioner and him the relationship of debtorcreditor as a consequence of the issuance by petitioner of the debentures. Since no indebtedness existed with respect to the debentures, the amounts accrued and deducted by petitioner as interest thereon could not represent interest. We, therefore, sustain the respondent. Decision will be entered under Rule 50. Footnotes
1. The record does not contain an explanation as to why these items were entered on the books of the petitioner in larger amounts than they appeared on the books of the proprietorship. ↩
2. This item was entered on petitioner's books as representing the value of the intangible assets, received by petitioner from the proprietorship, and as an offset to the liability "Debenture Bonds." ↩
3. The record does not contain an explanation as to why this item was entered on the books of the petitioner.↩
1. Son-in-law of Carl J. Hochenauer.↩